IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

PAUL TELLES,

    Plaintiff,

vs.                                      No. Civ. 99-999 LCS/ACE

SMITH'S FOOD & DRUG CENTERS, INC.,

    Defendant.

**DEFENDANT'S PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW REGARDING DAMAGES
ON THE IMPLIED "RECALL" CONTRACT CLAIM**

Following the bench trial for this matter, the Court found, contrary to the proposed Findings of Fact and Conclusions of Law submitted by Smith's Food and Drug Centers, Inc. ("Smith's"), that Smith's breached an implied contract to recall Plaintiff Paul Telles ("Plaintiff") for a seafood clerk position.  (See Partial Transcript, October 12, 2000 (Bench Trial Findings) at 10.)  Based upon that finding, the Court ordered the parties to submit proposed Findings of Fact and Conclusions of Law to assist it with determining Plaintiff's measure of recovery on the claim. Accordingly, without waiving its position that the evidence does not support the finding on the implied contract claim, Smith's submits the following set of proposed findings of fact and conclusions of law:

**FINDINGS OF FACT**

**Context**

1.       Smith's Food and Drug Centers, Inc. ("Smith's") is in the retail grocery business. It operates grocery stores in several western states, including New Mexico.

2.       Plaintiff Paul Telles ("Plaintiff") began working for Smith's in March 1986.  In

December 1991, after working in meat cutting departments at various Smith's stores, Plaintiff transferred to the meat department at store 483 in Las Cruces, New Mexico. For a time, Plaintiff worked as an assistant meat department manager. Thereafter, and until January 1998, he held a meat cutter position at store 483.

3. Ernie Padilla ("Padilla") was a meat cutter at store 483. He began working as a meat cutter at store 483 in September 1994.

4. In 1997, due to competition from Albertson's, Jewel-Osco and a Walmart super-center that resulted in severe revenue losses at store 483, store 483 implemented lay-offs in each of its departments. The two least senior meat cutters in the meat cutter department, Ron Knowles and Padilla, quit in October 1997 after learning that they faced imminent lay-off.

5. A second round of lay-offs occurred in early January 1998. Plaintiff, who was the least senior meat cutter at the time, was selected for lay-off. Starting on January 4, 1998, he no longer was scheduled to work.

6. In 1998, store 483 hired seafood clerks. Smith's distinguishes between its seafood clerk positions and its meat cutter positions; the positions are classified and regarded as distinct from one another.

7. Near the beginning of August 1998, Smith's hired Padilla as a seafood clerk. He had applied for the job which had been posted like all other store openings. Smith's did not regard its hiring of Padilla as a recall; instead, it classified Padilla as a new hire.

8. Plaintiff did not apply for any of the seafood clerk positions. Smith's did not hire or recall any meat cutters in 1998.

9. Padilla has remained in his seafood clerk position at store 483 since August 1998.

10. Following a bench trial on Plaintiff's claims against Smith's, this Court found that Smith's breached an implied contract by selecting Padilla, instead of Plaintiff, for the seafood clerk position. Although store 483 has never ratified a collective bargaining agreement with a union, the Court concluded that certain conduct by Smith's (see Partial Transcript, October 12, 2000 (Bench Trial Findings) at 6-7) resulted in an implied contract to follow Section 9 of a collective bargaining agreement that covers meat departments at other Smith's stores in New Mexico (the "Albuquerque CBA").[1]

11. Section 9 of the Albuquerque CBA contains provisions that address the effect of departmental seniority upon the sequence of lay-offs and recalls. With respect to recalls, Section 9.4 of the Albuquerque CBA provides that, "the last person laid off shall be the first person recalled, provided they have the ability to perform the work."

12. The Court interpreted that provision as requiring Smith's to recall Plaintiff (who had more seniority in the meat cutting department than Padilla) for the seafood clerk position in August 1998. Based upon that interpretation, the Court concluded that Smith's breached the recall provision in the Albuquerque CBA when it hired Padilla, rather than Plaintiff, for the seafood clerk position.

13. In its Bench Trial Findings, the Court tentatively concluded, with respect to a damages determination for the claim, that Plaintiff is entitled to recover the amount of money that Padilla has earned for the actual hours (excluding overtime pay; including vacation and personal

---

[1] Smith's and United Food & Commercial Workers, Local 1564 are the parties to the "Albuquerque CBA." According to its explicit terms, the Albuquerque CBA does not govern employment of meat cutters at Store 483. Rather, it covers the meat departments at several Smith's stores in Albuquerque.

day pay) that Padilla has worked from August 15, 1998 through October 14, 2000 in his seafood clerk position, less the amount of Plaintiff's actual earnings (<u>excluding</u> overtime pay; including vacation and personal day pay) for that period of time. The Court invited the parties to submit authority showing that the overtime pay earned by Padilla and Plaintiff should be included in that calculation.

**Padilla's Earnings Since August 1998**

*Hourly Rate(s) of Pay*

14. Padilla's total earnings (<u>including</u> pay for overtime, vacation and personal days) from August 15, 1998 through October 14, 2000 amount to $50,927.81. See Ex. A.

15. Padilla's initial hourly rate in the seafood clerk position was $10.80. Effective December 12, 1998, Padilla's hourly rate increased to $11.15 an hour. Effective July 1, 2000, Padilla's hourly rate increased to $11.42 an hour. Ex. B.[2] Padilla's payroll records reflect that the actual hours he worked fluctuated from week to week. See id. In between August 18, 2000 and October 14, 2000, he earned a total of $43,336.56 in regular pay. See id.

*Vacation Pay*

16. At Smith's, employees are not entitled to any paid vacation during their first year of employment. Thereafter the calculation of vacation pay is based on the average, non-overtime hours worked by an employee during the preceding year.

17. In Padilla's case, because he was not recalled from lay-off, but instead hired into a new position, he was not eligible for vacation pay until August 1999. At that time he received

---

[2] The parties have stipulated that Ex. B, which shows Ernie Padilla's regular hours, regular rates of pay, vacation and personal day pay, is accurate.

vacation pay of 32 hours (his average weekly hours for the preceding year) multiplied by his then current rate of pay, which came to $356.80.  Ex. B.  At his anniversary date in 2000, Padilla received 38 hours of pay at $11.42 an hour, which came to $433.96.  See id.

18.     Padilla, therefore, has earned a total of $790.96 in vacation pay since August 15, 1998.  See id.

*Personal Days*

19.      Smith's employees are not eligible to take personal days until their one-year employment anniversary.  Smith's personal days consist of one birthday credit, one anniversary credit and three personal credits, for a total of five "personal days."  Employees must either use or lose their personal days; in other words, if an employee does not use a personal day, the day does not carry over to a subsequent year.  The rate of pay for a personal day is based upon the average number of hours worked by an employee in the four weeks preceding the personal day (i.e., if an employee averaged 32 hours a week, the employee would be entitled to approximately 6.5 hours of pay at the employee's existing hourly rate for each personal day).

20.     Padilla was eligible for a maximum of 10 personal days (5 for 1999; 5 for 2000).

21.     During 1999 and 2000, Padilla took a total of seven personal days.  Ex. B.  He was paid a total of $594.73 for those days.  See id.

**Plaintiff's Earnings Since August 1998**

23.     Plaintiff has worked for Sutherland's, a lumber company located in Las Cruces, since at least August 1998.

24.     Plaintiff's total earnings (including pay for overtime and vacation) from August 15, 1998, through October 14, 2000, amount to $53,362.38.  See Ex. A.

*Hourly Rates of Pay*

25.	Plaintiff's initial hourly rate at Sutherland's was $7.50.  In January 1999 his hourly rate increased to $7.63 an hour.  In May 1999 his hourly rate increased to $8.06.  In September 1999 his hourly rate increased to $8.49.  In March 2000 his hourly rate increased to $8.78.  Paul Telles, Ex. C.[3]  In between August 18, 1998, and October 14, 2000, Plaintiff earned a total of $38,313.56 in regular and vacation pay.  See id.; see also Ex. D.

*Vacation Pay*

26.	Sutherland's provides paid vacations to its employees.  Plaintiff took week-long vacations in 1999 and 2000.  See Ex. D.

27.	Plaintiff received 40 hours of pay for each of his vacations.  See id.

*Personal Days*

29.	Sutherland's does not provide paid personal days to its employees.  See Ex. D.

30.	Plaintiff, therefore, did not earn any personal day pay between August 15, 1998, and October 14, 2000.

**Comparison of Earnings**

31.	The total pay earned by Ernie Padilla, including pay for overtime, vacation, personal days and regular hours, between August 15, 1998 and October 14, 2000, was $50,927.81.  Including the same earning components, Plaintiff earned a total of $53,362.38 during the same time period.  Plaintiff, therefore, earned $2,434.57 more than Padilla.  See Ex. A.

32.	Based on his hours (other than overtime) at a straight-time rate of pay and his

---

[3]	The parties have stipulated that Ex. C, which shows Paul Telles's regular hours, regular rates of pay, and vacation pay, is accurate.

vacation and personal day pay, Padilla earned a total of $43,336.56 between August 15, 1998, and October 14, 1998. Ex. B. Plaintiff earned a total of $38,313.56 during the same time period for the same categories of compensation. Ex. C; Ex. D. Under this measure of damages, Padilla earned $5,023.00 more than Plaintiff. (See id.)

## CONCLUSIONS OF LAW

33.    In an employment law context, a plaintiff who prevails on a breach of contract claim is entitled to recover the wages he would have earned had the contract not been breached, less the amount of earnings that the plaintiff earned or reasonably should have earned from other employment "in the time made available as a result of the breach." See Rule 13-851, NMRA 2000. See also Board v. Jennings, 102 N.M. 762, 764, 701 P.2d 361, 364 (1985) ("As a general proposition, the measure of damages to which a wrongfully discharged employee is entitled is the amount due during the remainder of the contract, reduced by any income the employee has earned, will earn, or which, by the exercise of reasonable diligence, he could have earned during the unexpired term.) (emphasis added); Fredenburgh v. Allied Van Lines, Inc., 79 N.M. 593, 596, 446 P.2d 868, 871 (1968) (In a breach of contract case, "[t]he measure of damages should be that which fully and fairly compensates for the injuries received.").

34.    Although the Court did not find Smith's liable under Title VII, the earnings components included within backpay awards under Title VII, provide an appropriate analog for determining the components of a backpay award for Plaintiff's recall claim. Backpay awards under both types of claims aim to restore all wages that a plaintiff could have earned had the plaintiff's employment not been terminated. See, e.g., E.E.O.C. v. Hacienda Hotel, 881 F.2d 1504, 1518 (9th Cir. 1989) ("[I]n awarding back pay under Title VII, the district court is required

to attempt to make" plaintiffs "whole by restoring them to the position in which they would have been."); Allen v. Allen Title Co., 77 N.M. 796, 798, 427 P.2d 673, 675 (1967) ("[T]he purpose of allowing damages in a breach of contract case is the restoration to the injured of what he has lost by the breach, and what he reasonably could have expected to gain if there had been no breach.").

35. Taking into account that premise, cases decided under Title VII shows that the amount of overtime pay that a plaintiff could have earned should be factored into a backpay award. See, e.g., Davis v. City of Dallas, 748 F. Supp. 1165, 1178 (N.D. Tex. 1990) (explaining that in the context of Title VII, "[b]ecause retroactive relief places the victim in the position he would have occupied but for the discrimination, back pay includes not only salary loss, but also compensation for overtime."); see also United States v. City of Warner, 138 F.3d 1083, 1097 (6th Cir. 1998) ("[L]ost overtime is a well-established part of a back pay award under Title VII.").

35. It is equally appropriate to factor in the amount of overtime pay earned by the plaintiff during his alternative employment. See, e.g., Reilly v. Cisneros, 835 F. Supp. 96, 103 (W.D.N.Y. 1993) (plaintiff's interim earnings, including overtime pay, were included in determination for back pay award), aff'd, 44 F.3d 140 (2nd Cir. 1995); see also Spurck v. Civil Serv. Bd., 42 N.W.2d 720, 728 (Minn. 1950) (discounting plaintiff's argument that the overtime pay that he earned with a different employer should not be included in lost pay determination).

36. Cases decided under Title VII also demonstrate that fringe benefits such as vacation pay should be factored into a back pay award. See, e.g., Cox v. American Cast Iron Pipe Co., 784 F.2d 1546, 1562 (11th Cir. 1986) (in a Title VII context, "overtime" and "fringe benefits such as vacation pay are among the items which should be included in back pay.") (internal quotation marks omitted).

37.     If a plaintiff, through his alternative employment, has earned more than he would have earned in the position at issue, he should not be awarded any back pay. See Board v. Jennings, 102 N.M. 762, 765, 701 P.2d 361, 364 (1985) ("[A] party whose contract has been breached is not entitled to be placed in a better position because of the breach than he would have been had the contract been performed.") (internal quotation marks omitted).

38.     The preceding authority demonstrates that it is appropriate to include overtime earnings to calculate Plaintiff's recovery for his recall claim. Applying that rule, the relevant payroll records show that Plaintiff did not suffer any damages as a result of Smith's not hiring him for the seafood clerk position. To the contrary, Plaintiff earned $2,434.57 more in his new job than he would have earned had Smith's hired him for the seafood clerk rather than Padilla. See ¶ 31. Because Plaintiff benefitted from, and did not sustain any damages as a result of Smith's decision to hire Padilla, Plaintiff should not recover any damages on his recall claim. (If the Court rules that overtime should be excluded in the damages calculation, Smith's requests that the Court limit Plaintiff's recovery on his recall claim to $5,023.00; the difference between Padilla and Plaintiff's actual earnings, inclusive of vacation and personal day pay and exclusive of overtime pay. See ¶ 32. That amount, as damages for back pay is subject to appropriate payroll withholding taxes.)

Respectfully submitted,

RODEY, DICKASON, SLOAN, AKIN & ROBB, P.A.,

By _____
    Thomas L. Stahl
    Jocelyn C. Drennan
Attorneys for Smith's
P.O. Box 1888
Albuquerque, N.M. 87103
Telephone: (505) 765-5900

CERTIFICATE OF SERVICE

    It is hereby certified that a true and correct copy of the foregoing Defendant's Proposed Findings of Fact and Conclusions of Law Regarding Damages on the Implied"Recall" Contract Claim, was mailed to G. Greg Valdez, Esq., Post Office Box 6176, Las Cruces, New Mexico 88006, on this __1st__ day of November 2000.

_____
Thomas L. Stahl