IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**PAUL TELLES,**

      **Plaintiff,**

vs.                                                        No. CIV 99-0999 LCS-ACE

**SMITH'S FOOD AND DRUG
CENTERS, INC.**

      **Defendant.**

### THE COURT'S FINDINGS OF FACTS AND CONCLUSIONS OF LAW

**THIS MATTER** came before the Court for a non-jury trial on October 10-12, 2000. At the conclusions of trial, the Court announced Findings of Fact and Conclusions of Law from the bench. The written Findings of Fact and Conclusions of Law contained herein supercede those announced from the bench.

**Findings of Fact**

    1.    Plaintiff, Paul Telles, is a citizen of New Mexico.

    2.    Defendant, Smith's Food & Drug Centers, Inc. (Smith's), is a Utah corporation doing business in this state.

    3.    This Court has subject matter jurisdiction over all claims. The Court has federal question jurisdiction over the federal claims and supplemental jurisdiction over the state law claims. Additionally, the Court has diversity jurisdiction.

    4.    The Court has personal jurisdiction over the parties.

5.      All of the activities that give rise to Plaintiff's claims arose within the State and District of New Mexico.

6.      Plaintiff is an Hispanic male.

7.      Plaintiff began working for Smith's in March of 1986, and he initially worked as a meat cutter at Smith's Store 482 in Las Cruces. Plaintiff held that position until 1988, when he transferred to a Smith's store in Tucson. Plaintiff stayed at the Tucson store as meat cutter until early 1991, and was transferred to Smith's Store 483 in Las Cruces, where he became an assistant meat department manager. After about five months in that position, Plaintiff transferred to Smith's Store 507 in El Paso. In El Paso, Plaintiff worked with William Denny.

8.      Plaintiff came back to Smith's Store 483 in Las Cruces on December 22, 1991. Plaintiff claims that his transfer was at the request of Defendant, and that Joe Montoya, the former Smith's personnel representative, told him that he would not lose seniority by going to Las Cruces, since the company instituted the transfer and not Plaintiff. I find that this testimony, in the light of all the other evidence in the case, is not credible.

9.      In 1997, construction on the Wal-Mart SuperStore in Las Cruces was ongoing, and that store was to open right across the street from Smith's in Las Cruces in October or November of 1997. A number of employees at Smith's were concerned about layoffs because of the opening of the Wal-Mart. In addition, a new Albertson's grocery store had already opened, and a new Raley's grocery store was opening in the area. In other words, there was considerable increased competition for Smith's in Las Cruces.

10.     During 1997, Plaintiff had complained to management of about his perception that his supervisor, Mr. Denny, was committing time clock theft. Plaintiff and Mr. Denny had a history of

conflicts in El Paso.

11.     On August 11, 1997, the seniority list was posted in the meat department. I find that Plaintiff's testimony that he did not know about the seniority list until later is not credible. Plaintiff was given a seniority date third to last; that is, the third most junior employee, with only Charles Knowles and Ernest Padilla lower than he was on the list.

12.     Plaintiff began to make complaints concerning racial discrimination to his superiors at Smith's later in 1997; "later" being after August 11, 1997. In fact, those complaints were made well after the seniority list was posted and Plaintiff had knowledge of it. Further, Paul Iott stated that racial concerns were never mentioned in late August by Plaintiff to him, and I so find. This finding is corroborated by Plaintiff's own handwritten notes, which are Exhibits 39 and 40, which he submitted to the EEOC. Therefore, any re-doing of the seniority list could not have been in retaliation for making complaints of racial discrimination.

13.     Plaintiff complained that Mr. Denney was committing time clock theft, that is, attending to personal business while on company time. Plaintiff also complained that Smith's failed to heed his reports of Mr. Denney's time clock theft because Plaintiff is Hispanic and Mr. Denney is Anglo. The primary thrust of all of Plaintiff's complaints was that he was being treated in a disparate manner because he was Hispanic. Plaintiff was making complaints about time clock theft to Anglos, and no one was doing anything about it. However, Plaintiff abandoned any claim of disparate treatment at closing argument, if not before.

14.     Plaintiff's remaining Title VII claim is retaliation for complaints of racism. Plaintiff complained about a number of things. A number of witnesses testified that Plaintiff complained about numerous matters. Even Plaintiff's wife testified that he came home, complaining. However, there

3

was no credible evidence that Plaintiff complained about race or racial discrimination or racial comments until December 1997, when Kevin Slowey testified that Plaintiff reported Mr. Denney's racial remarks to him.

15.     Interestingly, although Guillermo Vasquez submitted an affidavit on behalf of Plaintiff in opposition to Summary Judgment that Mr. Vasquez said that Mr. Denney told him that Plaintiff was given no more hours because of Plaintiff's filing of an EEOC complaint, that testimony never came out at trial and is, therefore, not considered by the Court in reaching its decision.

16.     Plaintiff was given no more hours after January 3, 1998.  The question becomes whether there was any retaliatory motive for Plaintiff hours being reduced to zero. Plaintiff has failed to sustain his burden of proof on this issue.  I find that Plaintiff's testimony on a number of these issues is not credible.  I base my credibility determination on Plaintiff's equivocal answers, his evasion of direct answers, and in his manner and appearance while testifying.  Plaintiff's sole remaining Title VII claim, the retaliation claim, must fail.

17.     Mr. Denny's testimony and credibility in a number of areas is also suspect.  However, the Court finds that the Title VII retaliation claim must fail because Plaintiff has not sustained his burden of proof with respect to that claim.

18.     Plaintiff also claims breach of implied employment contract.  The second Paragraph 9.4 in the union contract reads as follows:

> All employees, in the event of a layoff or transfer will be laid off or transferred in accordance with their established seniority within their respective seniority group, provided the employees retained or transferred have the ability to perform the work.  In recalling, the last person laid off will be the first person recalled, provided they have the ability to perform the work.

19. Smith's represented that the employees at Store 483 would have the benefits of the union contract. Smith's applied the second Paragraph 9.4 of the union contract at Store 483 though the conduct of its employees.

20. Smith's conduct would reasonably lead employees to believe that there was a contract with, *inter alia*, the following terms: First, Smith's honored the union seniority rules, without the union contract. Second, Smith's never terminated anyone without cause. Third, the company had a recall policy and employed it, even in the absence of the union contract. Fourth, once a work schedule was posted, it would not be changed without the approval of all persons on the list.

21. On August 20, 1997, Mr. Slowey faxed a seniority list to Store 483. On or about August 11, 1997, Mr. Denney posted this list in the meat department.

22. The union contract seniority was followed on the August 11, 1997 seniority list. At that time, everyone on the list had been classified as a journeyman meat cutter; thus, under the implied contract, which I find contained the provisions of Section 9 of the union contract, all of those persons were in the same seniority group, as that term is defined in the union contract.

23. Smith's followed the union contract in all matters and all ways set out in Paragraph 9 of the un4ion contract dealing with seniority, even at the Las Cruces store, and that paragraph is part of Smith's implied contract with Plaintiff.

24. The arbitration provision of the union contract was not a provision of the implied employment contract. To the contrary, the implied contract had no provision for any kind of hearing process at all to make any kind of determination that Plaintiff was terminated for just cause.

25. Mr. Knowles and Mr. Padilla left Smith's on the advice of Smith's supervisors because they knew and Smith's knew that they would be laid off in the near future because they lacked

seniority with Smith's.

26.     Plaintiff had the ability to perform all the work, both up front at the seafood counter and in the back meat cutting.

27.     Plaintiff's hours were reduced after January 3, 1998 because of legitimate economic reasons.

28.     Plaintiff was never terminated and was never given notice that he was terminated. In fact, Plaintiff's name was left on the work schedule for a long period of time. Plaintiff continued to come back to the Smith's store and look for hours that he could work through the week of April 19, 1998. Smith's knew that Plaintiff wanted hours to work.

29.     Plaintiff testified, and I so find, that during the week prior to April 19, 1998, he visited the meat department of Store 483 to extend invitations to a party. Plaintiff noticed that his name no longer appeared on the work schedule. Mr. Denney told Plaintiff he was no longer authorized to be in the meat department. As Plaintiff was purchasing party supplies from the store, Smith's employees scrutinized him as if they suspected him of shoplifting. Based on the conduct of Smith's employees, Plaintiff reasonably believed that he was constructively barred from Store 483 as of the week of Easter 1998. I find this aspect of Plaintiff's testimony to be fully credible.

30.     The seafood clerk position was posted in the meat department well after the week of Easter 1998. Plaintiff did not receive notice of the seafood clerk position because he was constructively barred from Store 483. Plaintiff never applied for the seafood clerk position in writing but Mr. Padilla did. Nevertheless, Smith's knew that Plaintiff was ready, willing, and able to take the position of seafood clerk.

31.     Plaintiff was the last person laid off as of August, 1998.

32.     All persons on the seniority list printed on August 7, 1997 were journeyman meatcutters.

33.     In August of 1998, Smith's offered Ernest Padilla the job of seafood clerk. When he left his employment at Smith's, Mr. Padilla was classified as a journeyman meat cutter, the same classification as Plaintiff. Both Plaintiff and Mr. Padilla were in the same seniority group as that term is defined in the union contract and the implied contract. Mr. Padilla was offered the position of seafood clerk at the rate of $10.45 an hour, and Plaintiff was not, even though Smith's knew Plaintiff was still looking for hours and, indeed, wanting hours from Smith's.

34.     The seafood clerk position is not now within the same seniority classification as the position of meat cutter. However, as of December 31, 1997, all meat department workers were classified as journeyman meat cutters for seniority purposes and all meat department employees performed the functions of seafood clerk. Both Mr. Padilla and Plaintiff were in the same seniority classification of journeyman meat cutter when the seniority list came out. Smith's offered the job of seafood clerk to a journeyman meat cutter who was junior to Plaintiff. This was in violation of the implied contract between Plaintiff and Smith's as evidenced by the union contract, which Smith's adopted in part.

35.     When the seafood clerk position was offered to Mr. Padilla in August, 1998, Smith's knew that Plaintiff was still working for Smith's, that he was still looking for hours at Smith's, and that, in essence, Plaintiff had applied for that position, as a matter of his conduct. Smith's knew of Plaintiff's conduct and knew of his interest, yet still hired Mr. Padilla.

36.     Mr. Padilla was called back to work and began working as a seafood clerk at Smith's on August 9, 1998.

37.     From August 9, 1998 to October 13, 2000, Mr. Padilla's gross pay was $50,927.81 and his overtime pay was $2,604.25. Mr. Padilla's regular and vacation pay plus premium pay was $48,323.56.

38.     During the period from August 9, 1998 to October 13, 2000, Plaintiff worked for Sutherland's, a lumber company in Las Cruces, New Mexico. During this period, Plaintiff's gross pay was $53,362.38, his overtime pay was $15,048.82 and his regular and vacation pay was $38,313.56.

39.     Smith's pays premium pay for evening and Sunday hours worked.

40.     Plaintiff would have worked the same premium pay hours as Mr. Padilla.

### Conclusions of Law

1.      In order to establish a claim for retaliation in violation of Title VII, Plaintiff had the burden of proving by a preponderance of the evidence that: (1) he engaged in protected opposition to discrimination or participation in a proceeding arising out of discrimination; (2) he was subjected to adverse employment action by his employer; and (3) a causal connection exists between the protected activity and the adverse action. *See McCue v. Kansas Dep't of Human Resources*, 165 F.3d 784, 789 (10th Cir.1999). Plaintiff must prove by a preponderance of the evidence that the retaliation was a motivating factor for any adverse employment action, although it need not be the sole or only motivating factor. *See Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 550 (10th Cir. 1999). Any re-doing of the seniority list could not have been in retaliation for making complaints of racial discrimination. Plaintiff failed to prove his Title VII retaliation claim. Plaintiff's sole remaining Title VII claim, the retaliation claim, must fail.

2.      Plaintiff abandoned any claim or disparate treatment under Title VII at closing

argument, if not before.

3. The New Mexico Court of Appeals has held that an implied contract can still exist in this state, in spite of a disclaimer, as there was in this case, where the employer's conduct reasonably leads employees to believe that they will not be terminated without just cause. *See Kiedrowski v. Citizens Bank*, 119 N.M. 572, 575, 893 P. 2d 468, 471 (Ct. App.) *cert. denied* 119 N.M. 389, 890 P. 2d 1321 (1995).

4. Smith's conduct would reasonably lead employees to believe that there was a contract with, *inter alia*, the following terms: First, Smith's honored the union seniority rules, without the union contract. Second, Smith's never terminated anyone without cause. Third, the company had a recall policy and employed it, even in the absence of the union contract. Fourth, once a work schedule was posted, it would not be changed without the approval of all persons on the list.

5. An implied contract did exist between Plaintiff and Defendant.

6. The implied contract required Smith's to rehire persons within the same seniority group in order of their seniority.

7. Plaintiff's claim that he was entitled to some kind of a hearing in connection with the reduction in his hours was not pled and is not supported by the law.

8. Under the implied employment contract, Plaintiff should have been recalled as seafood clerk before Mr. Padilla. It was inconsistent with the terms of the implied contact for Smith's to offer Mr. Padilla, from the journeyman meat cutter seniority group, with lower seniority than Plaintiff, the position of seafood clerk, and not to offer it to Plaintiff, a more senior person in the same seniority group.

9. Smith's breached the implied employment contract that existed between Plaintiff and

9

Smith's when Smith's offered employment to Mr. Padilla instead of Plaintiff as Plaintiff was the last person to be laid off and Mr. Padilla had left his employment at the behest of Defendant.

10. As a result of Defendant's breach of employment contract, Plaintiff has suffered damages.

11. Plaintiff would have worked the same premium pay hours as Mr. Padilla.

12. Plaintiff's damages are the amount Mr. Padilla earned as regular and vacation pay plus premium pay from August 9, 1998 to October 13, 2000, less the amount he actually earned in regular and vacation pay during the time made available as a result of the breach. *See* N.M.R.A., UJI-CIV 13-851 (2000).

13. Plaintiff's overtime pay was not earned in the time made available as a result of the breach.

14. From August 9, 1998 to October 13, 2000, Mr. Padilla's gross pay was $50,927.81 and his overtime pay was $2,604.25. Mr. Padilla's regular and vaction pay plus premium pay was $48,323.56

15. During the period from August 9, 1998 to October 13, 2000, Plaintiff worked for Sutherland's, a lumber company in Las Cruces, New Mexico. During this period, Plaintiff's gross pay was $53,362.38, his overtime pay was $15,048.82 and his regular and vacation pay was $38,313.56.

16. The difference between Plaintiff's regular and vactuion pay and Mr. Padilla's regular, vacation and premium pay is $10,010.00

17. Plaintiff is entitled to damages in the amount of $10,010.00, plus costs.

**A JUDGMENT CONSISTENT WITH THESE FINDINGS OF FACT AND**

**CONCLUSIONS OF LAW SHALL ISSUE.**

_____
**LESLIE C. SMITH
UNITED STATES MAGISTRATE JUDGE**